**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

YOLANDA GEVARZES,

        Plaintiff,

v.                                    Case No. 6:12-cv-1126-Orl-37DAB

CITY OF PORT ORANGE, FLORIDA,

        Defendant.

## ORDER

This cause is before the Court on the following:

1. Defendant City of Port Orange's Motion for Summary Judgment (Doc. 61), filed July 31, 2013;

2. Plaintiff's Response in Opposition to Defendant City of Port Orange's Motion for Summary Judgment (Doc. 68), filed September 3, 2013; and

3. Defendant City of Port Orange's Reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (Doc. 69), filed September 20, 2013.

Upon consideration, the Court finds that Defendant's motion is due to be granted.

## BACKGROUND[1]

Plaintiff is a deaf individual who primarily communicates using American Sign Language ("ASL"). (Doc. 48, ¶ 15.) This dispute began when Plaintiff and her boyfriend Lonnie Behrens met up with Jason McConnell, a friend of Behrens', for drinks at a

---

[1] The following factual allegations, derived from the record, are construed in the light most favorable to Plaintiff; the actual facts of the case may be different from those stated here. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).

Chili's Grill & Bar. (Doc. 60-2, Gevarzes Dep. 132:2–133:24.) Over the course of the evening, Plaintiff drank two glasses of wine and half of a Long Island Iced Tea. (*Id.* at 134:9–12, 135:6–10.) At the end of the night, Plaintiff became upset with McConnell because she thought that he did not leave enough tip for the bartender. (*Id.* at 137:20–138:23.) The argument became heated and continued outside the restaurant as they left. (*Id.* at 139:10.) McConnell yelled at Plaintiff, and she pushed him. (*Id.* at 139:14.) At one point, Behrens bear-hugged Plaintiff to try to physically remove her from the confrontation with McConnell. (*Id.* at 141:6–14; Doc. 60-1, Behrens Dep. 30:7–25.) Plaintiff did not see that it was Behrens who grabbed her. (Doc. 60-2, Gevarzes Dep. 141:11.) She then turned and bit him in the chest to release herself. (*Id.* at 141:13–14.) The bite left a bloody bruise and a welt on Behrens' chest and lipstick on his shirt. (Doc. 60-11, p. 6.)

At some point, witnesses called the police, who arrived while the altercation was still ongoing. (Doc. 60-2, Gevarzes Dep. 141:1–21; Doc. 60-1, Behrens Dep. 31:10–18; Doc. 60-4, McConnell Dep. 19:14–18.) There was a lot of commotion when the officers arrived. (Doc. 60-8, Kilpatrick Dep. 29:11–14.) Three police officers separated Plaintiff, Behrens, and McConnell and interviewed them individually. (Doc. 60-2, Gevarzes Dep. 141:25–142:9.) Officer Phillip Slease interviewed Plaintiff. (Doc. 60-7, Slease Dep. 29:7–9.) She indicated to him with gestures that she was deaf.[2] (*Id.* at 29:14–15; Doc. 60-2, Gevarzes Dep. 143:2.) At that point, Officer Slease provided Plaintiff with a

---

[2] Officer Slease also states that Plaintiff indicated that she could read lips. (Doc. 60-7, Slease Dep. 30:19–31:17.) He avers that he and the other officers spoke with her verbally and that she understood by gesturing and writing in return. (*Id.* at 30:2–32:14.) Plaintiff admits that she was taught to read lips, though she cannot do it completely accurately. (Doc. 60-2, Gevarzes Dep. 54:4–16.) However, she claims that she told Officer Slease that she could not communicate with lip reading that night. (*Id.* at 143:4–18.)

2

pen and paper, and she wrote two pages of notes stating that she was deaf, explaining the backstory of why she argued with McConnell, and asking to have Behrens translate for her.[3] (Doc. 60-9; *see also* Doc. 60-2, Gevarzes Dep. 143:6–148:13.) No ASL interpreter was brought to the scene. (Doc. 60-2, Gevarzes Dep. 151:2.) After the other officers completed their interviews with Behrens and McConnell and they determined Plaintiff to be the aggressor, they arrested Plaintiff for domestic battery. (Doc. 60-7, Slease Dep. 39:10–13; Doc. 60-2, Gevarzes Dep. 150:2–4.)

Plaintiff then brought this suit against Defendant City of Port Orange, claiming that the City's police violated the Americans with Disabilities Act ("ADA") and the Rehabilitation Act by failing to reasonably accommodate her disability during the course of her arrest. (Doc. 48.) Defendant has moved for summary judgment, arguing that Plaintiff's written communication with the police was effective enough such that they did not need to bring an interpreter to the scene. (Doc. 61, pp. 17–22.) Plaintiff opposed (Doc. 68), and Defendant replied (Doc. 69). This matter is now ripe for the Court's adjudication.

**STANDARDS**

**I.   Summary Judgment**

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a

---

[3] Plaintiff also claims that she wrote down an explicit request for an ASL interpreter on a third piece of paper, in addition to the two pages of handwritten notes in the police file. (Doc. 60-2, Gevarzes Dep. 148:1–24.) In Plaintiff's first deposition, she alleged that Defendant had the page and was "obviously . . . just trying to hide it." (*Id.* at 148:22–24.) In a later deposition, Plaintiff stated that *she* was actually in possession of the page and had given it to her lawyer. (Doc. 60-3, Gevarzes Dep. 14:24–15:21.) Her lawyer stated that she had not seen the page, and it was never placed into the record. (*Id.* at 15:22–16:4.)

3

matter of law." Fed. R. Civ. P. 56(a). A movant carries its burden by showing that there is an absence of evidence supporting the non-movant's case. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show a genuine issue for trial. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict" for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Which facts are material depends on the underlying substantive law. *Id.*

The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the non-movant. *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006). However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).

## II. Discrimination

"Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases." *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) (citing 29 U.S.C. § 794(d)). The Court will therefore consider the claims together.

The elements of an ADA claim are: (1) the plaintiff is a qualified individual with a disability; (2) she was either "excluded from participation in or denied the benefits of a public entity's services, programs, or activities" or "otherwise discriminated against by a

public entity";[4] and (3) the discrimination was on the basis of her disability. *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007). The failure of police to reasonably accommodate a disabled person during the course of an arrest can constitute discrimination by a public entity. *See id.* at 1085.

Importantly, the ADA does "not require a public entity to employ any and all means to make auxiliary aids and services accessible to persons with disabilities, but only to make 'reasonable modifications' that would not fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." *Id.* at 1082 (citing *Tennessee v. Lane*, 541 U.S. 509, 531–32 (2004)). The inquiry is therefore "whether, given criminal activity and safety concerns, any modification of police procedures is reasonable before the police physically arrest a criminal suspect, secure the scene, and ensure that there is no threat to the public or officer's safety." *Id.* at 1085. The reasonable-modification analysis is fact-specific. *Id.* at 1085–86 (noting that "[i]n many circumstances, oral communication plus gestures and visual aids or note writing will achieve effective communication"). Some factors to consider include: (1) exigent circumstances; (2) other possible effective means of communication; (3) the length, complexity, and context of the communication; and (4) the preferred method of communication of the individual. *Id.* at 1086–87. Effective communication does not require perfect communication. *See id.* (finding no discrimination where deaf person reading lips understood about 50% of exchange).

---

[4] As the U.S. Court of Appeals for the Eleventh Circuit has not yet decided whether an arrest constitutes a service, program, or activity within the first half of this prong of the test, the Court will analyze this claim under the catchall second half. *See Bircoll*, 480 F.3d at 1084–85.

**DISCUSSION**

Plaintiff contends that she should have been provided with an interpreter before she was arrested. (*See* Doc. 68, p. 15.) Defendant counters that Plaintiff's ability to communicate via written English meant that she was reasonably accommodated because she was given the opportunity to write notes to the police. (Doc. 61, pp. 18–23.) The Court agrees with Defendant.

Though Plaintiff prefers an ASL interpreter, the record plainly belies her contention that she cannot read and write in English. Handwritten notes from the night of her arrest show that she was sufficiently able to communicate with the officers on the scene. She wrote:

> Hi my name is Yolanda, I am Deaf. I try to explian [sic] to my boyfriend Lonnie—we don't have any problem w/my boyfriend about tip $—I try help explian [sic] to Jason. Seen he don't rembmer [sic] what I said, Lonnie to interpreter to him. I explain to him about tip. He paid $9.00 for tip, plus 5.00. Lonnie Interpreter. Lonnie use sign language. Can you talk w/Lonnie.

(Doc. 60-9, p. 1.) On a separate page, she wrote, "Jason don't understand what I said," and "Don't give Lonnie my key my car. No." (*Id.* at 2.) She also answered the officers' written yes-or-no questions. (*Id.*)

While the notes are far from grammatically perfect, they demonstrate that Plaintiff has a decent grasp of spelling, sentence structure, and narrative.[5] The notes also firmly establish both that she was able to provide her own account of the evening and that she understood the officers—the notes plainly show one side of a two-way conversation. In fact, Plaintiff even admits that her notes were responsive to the officers' questions.[6]

---

[5] Indeed, the use of "w/" as a colloquial abbreviation for "with" is particularly telling of someone with more than a passing familiarity with written English.

[6] However, Plaintiff cannot remember whether the officers were writing questions

6

(Doc. 60-3, Gevarzes Dep. 18:4–21.)

Ample other record evidence also shows Plaintiff's basic proficiency with written English. (Doc. 60-10.) When asked on a medical form which languages she speaks, she listed English as well as Sign Language. (*Id.* at 13.) Multiple handwritten notes to her various doctors establish that she was able to convey her complaints effectively on more than one occasion. (*See, e.g.*, *id.* at 3 ("I'm worry about my breast (Both) real bad. I need Dr. check on my breast. I don't know if I have cancer or lump. Please find out my breast."), 6 ("Yes, I'm bleeding. I don't know what happen. I was surgery last Dec. 7, 2010."), 7 ("Yes, I'm sick, dizzy and my stomach and I have stent in my neck. My eyes like blurs.").) In addition to this uncontroverted evidence, Plaintiff also graduated from a mainstream high school where she passed English classes, once held a clerical job where she had to organize records, and reads notes from her child's teacher, which all demonstrate her reading and writing abilities. (Doc. 60-2, Gevarzes Dep. 26:10–32:15, 49:22–52:2, 16:1–17:16.)

Thus, the record clearly demonstrates that Plaintiff can read and write in basic English and that she did so on the night of her arrest.[7] (*See id.* at 83:6–13 ("[A]s long as

---

to her on a separate piece of paper or whether she was reading their lips. (Doc. 60-3, Gevarzes Dep. 18:12–21.) No pieces of paper other than those two pages are in the record, and Officer Slease maintains that Plaintiff was reading his lips and responding to his verbal questions. (Doc. 60-7, Slease Dep. 30:2–32:14.)

[7] Further, Plaintiff's interview on the night of her arrest was very straightforward; there was not much story to tell. (In fact, Behrens' interview lasted all of about five minutes. (*See* Doc. 59, Audio Recording.)) Behrens grabbed her, and she bit him—the physical evidence of the bite was evident on his body and her lipstick was smeared on his shirt. (*See* Doc. 60-11, p. 6.) The police did not have to engage in a complex, lengthy interaction with Plaintiff to figure that much out. Thus, there was was even less need for sophisticated communication here than there was in *Bircoll*, where the deaf individual was instructed to perform a series of field sobriety exercises to determine whether he was impaired. *See* 480 F.3d at 1086 (holding that providing an interpreter for a DUI stop was not reasonable, in part because such interactions "do not involve

the sentence is short and simple, and as long as I know the English word which correlates to a sign that I know, then I can understand it.").) While not perfect, her simple written communication was effective, and that is enough to comply with the Rehabilitation Act and the ADA. *See Bircoll*, 480 F.3d at 1086 (noting that "[w]hile the communication may not have been perfect," it "was not so ineffective that an . . . interpreter was necessary to guarantee that [the plaintiff] was on equal footing with hearing individuals"); *Patrice v. Murphy*, 43 F. Supp. 2d 1156, 1161 (W.D. Wash. 1999) ("Where plaintiff is able to communicate with the officers using printed forms and her written statements, with no apparent difficulty or loss of meaning (as was the case here), no additional accommodation is required.").

Further, while this did not seem to be an emergency situation, there were certainly exigent circumstances present that also weighed against stopping the investigation to bring an interpreter to the scene. Domestic violence situations are inherently volatile. (*See* Doc. 60-7, Slease Dep. 39:14–25, 63:24–64:21; *see also* Doc. 68-1, McIlrath Dep. 11:1–10 (noting that Defendant's domestic violence training policy is a "high liability policy").) Here, when the police arrived, there was a lot of yelling, the individuals appeared to be drunk, and they were right in front of a crowded bar late at night. (Doc. 60-7, Slease Dep. 39:22–25; Doc. 60-4, McConnell Dep. 16:8–19, 19:14–21.) To ask the police to just attempt to maintain this uncertain status quo while everyone waited around for an interpreter—despite the fact that Plaintiff was communicating in writing—is simply not reasonable. *See Patrice*, 43 F. Supp. 2d at 1160 ("Where underlying criminal activity has occurred, such as . . . domestic violence, and the officers are engaged in an on-the-street response, lengthy communications").

investigation, and arrest, forestalling all police activity until an interpreter can be located to aid communication with the deaf protagonist would be impractical and could jeopardize the police's ability to act in time to stop a fleeing suspect, physically control the situation, or interview witnesses on the scene."); *see, e.g.*, *Tucker v. Tennessee*, 539 F.3d 526, 535–36 (6th Cir. 2008) (finding a domestic violence situation to be an exigent circumstance, and holding that providing an interpreter was unreasonable); *cf. Bahl v. Cnty. of Ramsey*, 695 F. 3d 778, 785 (8th Cir. 2012) (holding that a fairly routine traffic stop presented an exigent circumstance such that it would be unreasonable to wait for an interpreter).

In sum, Defendant has demonstrated that, based on the undisputed facts,[8] bringing an interpreter to the scene of Plaintiff's arrest was not a reasonable modification of police procedure, given her effective written communication and the totality of the circumstances. *See Bircoll*, 480 F.3d at 1086. Summary judgment is therefore due to be granted in favor of Defendant.[9]

---

[8] While there are factual disputes about whether Plaintiff requested a professional interpreter and whether she could read the officers' lips, *see supra* notes 2–3, these disputes are not material and thus do not preclude summary judgment because the uncontroverted handwritten evidence in the record establishes that Plaintiff effectively communicated with the police on the night of her arrest.

[9] The Court also notes that, apart from the issue of effective communication, the absence of any evidence of damages is likely fatal to Plaintiff's claim. To recover compensatory damages under the Rehabilitation Act and the ADA, a plaintiff must demonstrate intentional discrimination. *Badillo v. Thorpe*, 158 F. App'x 208, 214 (11th Cir. 2005). Intentional discrimination is determined by a deliberate-indifference standard. *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012). There is no evidence to show that the police officers here deliberately chose to deprive Plaintiff of effective communication, given that she *was* communicating with them through writing and was responsive to their questions. (Doc. 60-7, Slease Dep. 30:2–32:14; *see also* Doc. 60-9.) Further, even if there were some evidence that the individual officers were deliberately indifferent, there is nothing linking that to the City. (*See* Doc. 60-7, Slease Dep. 62:2–63:23 (noting that it was City policy to provide an interpreter if an officer was unable to effectively communicate with an individual, and

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1. Defendant City of Port Orange's Motion for Summary Judgment (Doc. 61) is **GRANTED**.

2. The Clerk is **DIRECTED** to enter judgment in favor of Defendant. Plaintiff shall take nothing on her claims. Defendant is awarded costs.

3. The Clerk is further **DIRECTED** to close this case. All pending motions are **DENIED AS MOOT** and all existing deadlines are **VACATED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on December 2, 2013.

*[signature]*

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record

---

that the officer does not have discretion to ignore that policy).)